# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

In re:                                          :        CHAPTER 11
                                                :
SYNTAX-BRILLIAN CORPORATION, *et al.*,[1]  :
                                                :        Case No. 08-11407 (KJC)
        Debtors                                 :
                                                :        (D.I. 2495, 2504, 2509, 2520, 2521, 2522,
                                                :        2524, 2526, 2527, 2529)

---

## OPINION[2]

BY:   **KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the Motion of the SB Liquidation Trust and Lender Trust (Docket No. 2495), made by and through their trustee Geoffrey L. Berman (the "Trustee"), for the following relief: (i) authorizing the Liquidation Trust to make a final distribution; (ii) establishing a reserve for anticipated ongoing litigation expenses; (iii) approving a bar order; (iv) closing the Debtors' chapter 11 cases; (v) terminating the engagement of Epiq Bankruptcy Solutions, LLC ("Epiq"); (vi) further extending the term of the Trusts; and (vii) authorizing the destruction or disposal of the remaining documents, books and records of the Debtors and the Trusts at specified times (the "Final Decree Motion").

Numerous shareholders filed objections to the Final Decree Motion:

(1)     Notice of Demand on the SBC Liquidation Trustee to Refrain from Destroying SBC's Forged Documents or SBC's Falsified Books and Records filed by Frank Waitkus, Jr. (Docket No. 2497);

---

[1] The debtors are the following entities: Syntax-Brillian Corporation, Syntax-Brillian SPE, Inc., and Syntax Groups Corporation (jointly, the "Debtors"). On May 17, 2016 (Docket No. 2346), Judge Brendan Linehan Shannon entered an Order reassigning the bankruptcy cases to me.

[2] This Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 157 and § 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O). Venue is proper under 28 U.S.C. § 1408.

(2)     Objection to the Motion of the SB Liquidation Trust and Lender Trust for Entry of an Order and Final Decree filed by Frank Waitkus, Jr. (Docket No. 2498);[3]

(3)     Objection to the Motion of the SB Liquidation Trust and Lender Trust for Entry of an Order and Final Decree filed by Brent Barker (Docket No. 2499);

(4)     Objection to the Motion of the SB Liquidation Trust and Lender Trust for Entry of an Order and Final Decree filed by Denise Warren (Docket No. 2500);

(5)     Objection to the Motion of the SB Liquidation Trust and  Lender Trust for Entry of an Order and Final Decree filed by Rod Comer (Docket No. 2502);

(6)     Objection to the Motion of the SB Liquidation Trust and Lender Trust for Entry of an Order and Final Decree filed by Yehia Amr (Docket No. 2503);

(7)     Demand of Dr. Yehia Amr for a Change of Venue for the Hearing for an Order and Final Decree (Docket No. 2504);

(8)     Notice of Demand on the Clerk of the Court to Complete the Record and to Refrain from Any Further Tampering with the Record filed by Yehia Amr (Docket No. 2505);

(9)     Notice of Demand on the SBC Liquidation Trustee to Refrain from Destroying Forged Documents and Any of SBC's Falsified Books and Records filed by Laura Lipton (Docket No. 2506);

(10)    Objection to the Motion of the SB Liquidation Trust for Entry of an Order and Final Decree filed by Gregory W. Lange (Docket No. 2507); and

(11)    Objection to the Motion of the SB Liquidation Trust and Lender Trust for Entry of an Order and Final Decree filed by Alan Levine (Docket No. 2510).[4]

Also, in response to the Final Decree Motion, one shareholder (Alan Levine) filed a Motion to Disqualify and Terminate the Liquidation Trustee and the Professionals of the Liquidation Trust from Proceeding on Impeached Evidence (Docket No. 2509) (the "Disqualification Motion").[5]

---

[3] Frank Waitkus, Jr. also filed the Interrogatory in Support of Objection to the Motion for a Final Order to Close the Case (Docket No. 2508).  However, as he did not appear to prosecute his Objection, the Court did not consider the "Interrogatory."

[4] The responses described in numbers 1 through 11 are jointly referred to herein as the "Objections."

[5] Alan Levine did not appear, either by telephone or in person, at the June 18, 2018 hearing to prosecute the Disqualification Motion and, therefore, it is dismissed.  Moreover, I previously heard and denied similar Motions to Disqualify and Terminate the Liquidation Trustee and the Professionals of the

Further, six shareholders filed motions for my recusal, all having the same title: "Motion to Recuse Judge Kevin Carey for His Role in Facilitating the Undocumented Newell Transaction and for His Role in Obstructing Justice and Delaying the Recovery of the $7 Million in Stolen Money" (the "Recusal Motions").[6]

The Trustee filed an Omnibus Reply and Objection to Pleadings filed by Certain Shareholders (the "Reply")[7] in response to the Objections and the Disqualification Motion. The Recusal Motions were filed after the Reply.

On June 28, 2018, this Court held a hearing on the Final Decree Motion and the objections and responses thereto. Three shareholders appeared at the hearing: Charles Cerny, Caroline Kushner, and Brent Barker.[8]  On the Trustee's motion, the Declaration of Geoffrey L. Berman in support of the Final Decree Motion was admitted into evidence without objection (the "Declaration").[9]  Mr. Berman was present in court. No party asked to cross-examine him. After the hearing, I took the Recusal Motions and the Final Decree Motion under advisement. For the

---

Liquidation Trustee for Proceeding on Impeached Evidence filed by shareholders, including Levine. *In re Syntax-Brillian Corp.*, 554 B.R. 723 (Bankr. D. Del. 2016).

[6] The Recusal Motions were filed by Frank Waitkus (Docket No. 2520); Christopher C. Fey (Docket No. 2521); Brent Barker (Docket No. 2522); Caroline Kushner (Docket No. 2524); Laura Lipton (Docket No. 2526); Gregory W. Lange (Docket No. 2527); and Elliot Sabbagh (Docket No. 2529) (the "Recusal Motions").

[7] Docket No. 2518.

[8] Charles M. Cerny filed the "Motion for the Court, *inter alia*, to take Judicial Notice of the Movie "The China Hustle" and Response to Motion of the SB Liquidation Trust and Lender Trust for Entry of an Order and Final Decree . . ." (Docket No. 2501). Mr. Cerny appeared at the hearing and stated that his filing was not an objection to the Final Decree Motion, but only a request that the Court take Judicial Notice of "The China Hustle." (Tr. 6/28/2018 at 23"15-16). First, I note that Mr. Cerny is also a party to the Shareholder Settlement dated October 2, 2013 and has no standing to be heard in this case. *See In re Syntax-Brillian Corp.*, 554 B.R. 323, 325-27 (Bankr. D. Del. 2016). Moreover, Mr. Cerny's request for judicial notice will be denied on the merits. "Federal Rule of Evidence 201 authorizes a court to take judicial notice of an adjudicative fact 'not subject to reasonable dispute'... so long as it is not unfair to a party to do so and does not undermine the trial court's fact finding authority." *In re Indian Palms Assoc., Ltd.*, 61 F.3d 197, 205 (3d Cir. 1995). It is not appropriate to take judicial notice of the contents of the movie as it is not an adjudicative fact not subject to reasonable dispute. Also, the film's supposed relevance to the Final Decree Motion is not explained. Therefore, Mr. Cerny's request that the Court take judicial notice will be denied

[9] Docket No. 2525. Tr. 6/28/2018 at 5:1-8.

3

reasons set forth in this Opinion, the Disqualification Motion, the Demand for Change of Venue and the Recusal Motions will be denied. All objections to the Final Decree Motion will be overruled and the Final Decree Motion will be granted in full.

BACKGROUND

On July 8, 2008, the Debtors filed voluntary chapter 11 petitions in this Court. The Debtors were engaged in the business of manufacturing and distributing high-definition televisions under the "Olevia" brand name.[10] The company tried and failed to sell itself in the first few months of the case and promptly shut down operations.[11] The company was the victim of fraud, apparently perpetrated by certain members of its management team as well as its suppliers in the Far East.[12]

On July 6, 2009, the Court entered an Order[13] confirming the Debtors' Second Amended Chapter 11 Liquidation Plan.[14] The Plan's effective date was July 7, 2009.[15] The Plan authorized the establishment of two trusts as of the Effective Date: the Liquidation Trust and the Lender Trust.[16]

The Lender Trust

The Lender Trust's purpose is to use the Lender Trust Assets to satisfy Allowed Administrative Claims and Allowed Claims in Classes 1 through 3 (*i.e.*, Non-Tax Priority Claims, Priority Tax Claims, and Secured Tax Claims).[17] The Trustee reports that all of the Lender Trust

---

[10] *In re Syntax-Brillian Corp.*, 400 B.R. 21 (Bankr. D. Del. 2009). *See also* Disclosure Statement, p. 9 (Docket No. 1005).

[11] *In re Syntax-Brillian Corp.*, 551 B.R. 156, 158 (Bankr. D. Del. 2016).

[12] *Id.*

[13] The "Confirmation Order," Docket No. 1529.

[14] The "Plan," Docket No. 1016.

[15] The "Effective Date," Docket No. 1533.

[16] Plan, Article VI(A)(1) and (2). Capitalized terms not defined herein are defined in the Plan.

[17] Plan, Article VI(A)(2). The Allowed Administrative Claims and the Allowed Claims in Classes 1 through 3 are the "Lender Trust Claims." Plan, Article I(C)(61).

Claims have been paid in full, satisfied, withdrawn, disallowed, expunged or otherwise resolved.[18]
After payment of the Lender Trust Claims, the remaining beneficiaries of the Lender Trust are all
holders of Pre-Petition Credit Facility Claims and DIP Facility Claims (the "Lender Trust
Beneficiaries").[19] The Trustee has monetized the Lender Trust Assets and has made aggregate
distributions of approximately $3,383,400 to the Lender Trust Beneficiaries, and currently holds
$396,352.27 in cash for distribution.[20] The Lender Trust also will make an in-kind distribution
to the Lender Trust Beneficiaries of stock in a non-public foreign entity (representing less than 1%
of the equity of that entity) having an estimated value of less than $25,000.[21] The Lender Trust
also holds an allowed interest in the Circuit City Liquidating Trust and continues to receive
distributions from that Trust.[22] The Trustee will assign the interest in Circuit City Liquidating
Trust to the Lender Trust Beneficiaries in conjunction with the closure of the Lender Trust.[23]

The Liquidation Trust

The Liquidation Trust's purpose is to hold the Liquidation Trust Assets, pursue certain
causes of action, and make distributions to the Liquidation Trust Beneficiaries, consistent with the
terms of the Liquidation Trust Agreement.[24] The beneficiaries of the Liquidation Trust are holders
of Allowed General Unsecured Claims.[25]

The Trustee reports that he has monetized the Liquidation Trust Assets that have realizable
value and, to date, has made a cumulative 21% distribution to holders of Allowed General

---

[18] Final Decree Motion, ¶ 19.
[19] Plan, Article I(C)(60).
[20] Final Decree Motion, ¶ 19.
[21] Id.
[22] Id.
[23] Id.
[24] Plan, Article VI(A)(1).
[25] Plan, Article I(C)(69).

Unsecured Claims.[26]  The Trustee determined, in consultation with the Creditor Representatives of the Liquidation Trust, that any remaining assets of the Liquidation Trust have no realizable value and, accordingly, there are no further Liquidation Trust Assets, other than cash, to administer and distribute.[27]

Shareholder Litigation

On the Plan's Effective Date, Class 7 Equity Interests were cancelled and holders of Allowed Equity Interests did not receive any distribution under the Plan.[28]  Notwithstanding this, the Plan provided that:

> if prior to the closing of the Chapter 11 Cases the Liquidating Trustee, in consultation with the Creditor Representatives, determines that Residual Equity Assets are available for distribution to Holders of Allowed Equity Interests (meaning that additional assets are available after satisfying in full all other pre- and post-Petition Date claims), then, upon reasonable notice to the Holders of Allowed Equity Interests as of the Equity Interest Record Date (which will be March 11, 2009), and to the United States Trustee, the Liquidating Trustee will file a motion with the Bankruptcy Court requesting approval of procedures for making distributions to the Holders of Allowed Equity Interests as of the Equity Interest Record Date.  The Debtors do not believe that any assets will be available for such distributions.[29]

The Trustee is not making a 100% distribution to creditors under the Lender's Trust or the Liquidation Trust, so it follows that there are no assets available for distributions to the shareholders.

Nevertheless, the Trustee asserts that he and his professionals have spent substantial time and resources over the past nine years responding to incessant, duplicative and meritless pleadings

---

[26] Final Decree Motion, ¶ 18.  Specifically, the Trustee issued a 15% interim distribution to holders of Allowed General Unsecured Claims pursuant to an Order dated May 29, 2013 (Docket No. 2194) and a 6% interim distribution pursuant to an Order dated January 15, 2015 (Docket No. 2279).  Final Decree Motion, ¶ 18.

[27] Final Decree Motion, ¶ 18.

[28] Plan, Article IV(A)(7).

[29] *Id.*

filed in the chapter 11 cases by *pro se* shareholders, including shareholder Ahmed Amr ("Amr") and shareholders that appear to be acting directly through Amr or at his direction.[30] The Trustee further asserts that a number of shareholders have threatened to continue litigation against the Trusts, the Trustee and his professionals in both the United States and beyond.[31]

## DISCUSSION

(1)      The Recusal Motions

The Recusal Motions were filed after the deadline for filing objections to the Final Decree Motion.[32] At the June 28, 2018 hearing, the Liquidation Trustee said that he treated the Recusal Motions, which had not been set for hearing, as objections to the Final Decree Motion.[33] In reality, the Recusal Motions are late attempts to keep the case open in the continuing, desperate effort of disaffected shareholders to seek relief that this Court is unable to award or to which the movants are not entitled.[34] I will not schedule the Recusal Motions for further hearing and address the "merits" of the motions below.

Only Brent Barker and Caroline Kushner appeared at the hearing to press their recusal motions. The remaining Recusal Motions are denied for failure of the movants to appear (either by telephone or in person) and prosecute them.[35]

Barker's Motion to Recuse includes the following allegations and demands:

---

[30] Declaration, ¶ 6.

[31] Final Decree Motion, ¶ 2. For example, the Trustee described *pro se* litigation initiated in Canada by a shareholder against the Debtors' former financial advisors, which was dismissed by an Order of the Supreme Court of British Columbia on October 16, 2017. *Id.* n. 4.

[32] The objection deadline for the Final Decree Motion was May 31, 2018. The Recusal Motions were filed on June 25, 26, 27 and 28, 2018.

[33] Tr. 6/28/2018 at 15:25 – 16:15.

[34] I suspect, as the Liquidation Trustee suggests with respect to the Objections, that the Recusal Motions also were ghostwritten by Amr. Reply, ¶¶ 1-3.

[35] The Recusal Motions that are dismissed for failure to appear and prosecute include those filed by Frank Waitkus  (Docket No. 2520), Christopher C. Fey (Docket No. 2521), Laura Lipton (Docket No. 2526), Gregory Lange (Docket No. 2527), and Elliot Sabbagh (Docket No. 2529).

- That Judge Kevin Carey should be recused for his "role in facilitating the theft of $7 million from the United States Custom Service."

- That Barker is "a victim of the SBC fraud and forgery scheme, and I am appalled that the court in Delaware is trying to muzzle my representative, Ahmed Amr, in this venue. Mr. Amr is my representative and my counsel and I fully support and depend on his forensic analysis of the "Newell Transaction" which is included . . . as an exhibit."[36]

- Although the Plan requires the filing of a settlement agreement for any settlement over $250,000, Judge Kevin Carey "executed a $7 million transaction without filing a settlement agreement and without scheduling a hearing to allow parties of interest to question the bona fides of the $7 million transaction."

- Judge Kevin Carey "quashed Notices to Admit served on his co-conspirator Margaret Newell."

- Judge Kevin Carey "squashed the efforts of the SBC Qui Tam Commission to recover the $7 million stolen from the Customs Service."

- Judge Kevin Carey and Margaret Newell "engaged in intimidating the Qui Tam Advocate, Ahmed Amr" and "engaged in serious criminal misconduct that led to the arrest of the SBC Qui Tam Advocate."

- Judge Kevin Carey "obstructed justice by entering an order to prevent the SBC Qui Tam Advocate from filing any documents to derail the efforts of the SBC Qui Tam Commission."

- Judge Kevin Carey's "actions have tainted these proceedings."

- Judge Kevin Carey "has no jurisdiction to adjudicate a crime of forgery."

- Judge Kevin Carey "has a history of treating the facts and the evidence with contempt."

- Barker moved the Court "to replace Judge Kevin Carey and refer him to the United States Attorney General pending the intervention of a special counsel and I [Barker] move for any relief the court might grant under these exceptional circumstances."

- Barker moved the Court "to expedite the change of venue from Delaware."

- Barker "incorporate[d] all previous motions to recuse Judge Kevin Carey and the motions to recuse Judge Brendan Shannon into this motion;" and

---

[36] There were no exhibits attached to Mr. Barker's Motion to Recuse. (Docket No. 2522).

- Barker again stated that "Ahmed Amr is my representative and my counsel and I fully support and incorporate the facts as stated in the forensic analysis of the 'Newell Transaction' as submitted by SBC Qui Tam Advocate, Ahmed Amr."

Kushner's Motion to Recuse is not identical to Barker's motion, but many of the allegations and demands are strikingly similar. Kushner does not state that Ahmed Amr is her representative, but she "incorporate[s] the facts as stated in the forensic analysis submitted by SBC Qui Tam Advocate, Ahmed Amr" into her motion.

Preliminarily, I must address Barker's statements that Ahmed Amr is his "representative" and that Barker is relying on documents prepared by him. Amr is not permitted to act as Barker's legal representative in this proceeding for two reasons. First, "[o]ne *pro se* litigant cannot represent another."[37] While a non-attorney may appear on his own behalf, "that privilege is personal to him and he has no authority to appear as the attorney for anyone other than himself."[38]

Second, in a previous decision, I determined that Amr has no standing to appear or be heard on any matter in this chapter 11 case pursuant to a Shareholder Settlement and Notice of Withdrawal of Certain Shareholder Claims and Pleadings (Docket No. 2245), in which he and other settling shareholders agreed that:

> Neither they, nor any person or entity affiliated with or controlled by any of them, or on whose behalf any of them are acting or may act pursuant to any agreement, arrangement or applicable law, shall (i) be parties-in-interest in the Chapter 11 Cases or appear at any hearing in the Chapter 11 Cases; (ii) have any interest of any kind, whether contingent, beneficial or otherwise, in the Liquidation Trust, or (iii) hereafter acquire directly or indirectly any interest of any kind, whether contingent, beneficial or otherwise, in the Liquidation Trust. *The Shareholders shall not advise, encourage or otherwise assist any person or entity in filing or*

---

[37] *Nocula v. UGS Corp.*, 520 F.3d 719, 725 (7th Cir. 2008) (citing 28 U.S.C. § 1654). *See also Osei-Afriyie v. Med. Coll. Of Pa.*, 937 F.2d 876, 882-83 (3d Cir. 1991) (a non-lawyer appearing *pro se* may not act as an attorney for his children).
[38] *United States v. Stepard*, 876 F.Supp. 214, 215 (D. Ariz. 1994).

> *asserting any claim, right, demand, pleading or allegation of any kind in the Chapter 11 Cases or against any of the Estate Parties.*[39]

Amr expressly agreed not to "advise, encourage, or otherwise assist any person or entity" in filing any claims or pleadings in the chapter 11 cases. Because of the Shareholder Settlement, Amr was permitted to join the hearing on June 28, 2018 by telephone as a "listen-only" participant, but he was not permitted to speak or participate at the hearing.[40] Moreover, the Trustee points out that it is likely that Amr is ghostwriting pleadings for others to file because many of the objections and motions filed by the shareholders are substantially similar, if not identical to each other.[41] Despite the Trustee's (and the Court's) suspicions that Amr is ghostwriting the pleadings, I will nonetheless consider the Recusal Motions of those shareholders who appeared at the June 28, 2018 hearing.

Bankruptcy Rule 5004 provides that 28 U.S.C. § 455 governs whether a bankruptcy judge shall be disqualified from presiding over a proceeding or contested matter.[42] A majority of courts have concluded that § 455 "calls for a motion to disqualify to be heard by the judge whose

---

[39] *In re Syntax-Brillian Corp.*, 554 B.R. 323, 326 (Bankr. D. Del. 2016) (emphasis added). The District Court also agreed that "Appellant [Amr] has clearly waived his bankruptcy standing by virtue of his entry into the Shareholder Settlement and Notice of Withdrawal." *Amr v. Greenberg Traurig LLP (In re Syntax-Brillian Corp.)*, Civ. No. 13-337, 2016 WL 7177615, *7 (D. Del. Dec. 9, 2016).

[40] In pleadings, Amr claims to have withdrawn from the Shareholder Settlement. However, he cannot do so unilaterally. As I have previously instructed, he must file a motion and provide other parties with notice and an opportunity to be heard before I can determine whether there are grounds to release him from his promises and obligations under the Shareholder Settlement. He has not filed such a motion. At this point, these chapter 11 cases will be closed and any such motion would now be untimely.

[41] *See, e.g.,* the substantially similar format of the Recusal Motions filed by Frank Waitkus (Docket No. 2520), Christopher C. Fey (Docket No. 2521), Brent Barker (Docket No. 2522), Caroline Kushner (Docket No. 2524), Laura Lipton (Docket No. 2526), Gregory Lange (Docket No. 2527), and Elliot Sabbagh (Docket No. 2529). *See also, e.g.,* objections filed by Frank Waitkus (Docket No. 2498), Brent Barker (Docket No. 2499), Denise Warren (Docket No. 2500), and Gregory Lange (Docket No. 2507), as well as substantially similar objections filed by Rod Comer (Docket No. 2502) and Yehia Amr (Docket No. 2503).

[42] Fed. R. Bankr. P. 5004. *See also In re Syntax-Brillian Corp.*, 400 B.R. 21, 25 (Bankr. D. Del. 2009) (citing Fed. R. Bankr. P. 5004). "It is well settled that another federal judicial disqualification statute, 28 U.S.C. § 144, applies only to district court judges, and not bankruptcy judges." *Id.* (citing *In re Norton*, 119 B.R. 332, 334-35 (Bankr. N.D. Ga. 1990)).

disqualification is sought."[43]  "It might seem odd that recusal issues should be decided by the very judge whose recusal is in question.  But there are other considerations at work, including a desire for expedition and a concern to discourage judge shopping."[44]

"Section 455 provides that a judge is required to recuse himself 'in any proceeding in which his impartiality might reasonably be questioned.'"[45]  "The test for recusal under section 455(a) is whether a "reasonable person, with knowledge of all the facts, would conclude that the judge's impartiality might reasonably be questioned, not whether a judge actually harbors bias against a party."[46]  Section 455(b)(1) requires a judge to recuse himself when "he has a personal bias or prejudice concerning a party."[47]  "Under either subsection of section 455, the bias necessary to require recusal generally must derive from a source outside of the official proceedings.[48]  "Hence, 'judicial rulings alone almost never constitute a valid basis for a bias or partiality motion.'"[49]

The Movants provided no evidence to support any of the factual allegations contained in the Recusal Motions.  Nor could they, because the allegations merely twist strands of actual fact into grandiose knots of conspiracy and vitriol directed at all individuals whose understanding of this case does not align with the shareholders' quest for repayment outside of the  structure and priorities set by the Bankruptcy Code. For example, the Recusal Motions contain a number of

---

[43] *Syntax-Brillian,* 400 B.R. at 25.

[44] *In re Martinez-Catala,* 129 F.3d 213, 220 (1st Cir. 1997).

[45] *Amr v. Greenberg Traurig LLP (In re Syntax-Brillian Corp.),* Civ. No. 13-337, 2016 WL 7177615, *9 (D. Del. Dec. 9, 2016) (quoting 28 U.S.C. § 455(a)).

[46] *Amr v. Greenberg,* 2016 WL 7177615, *9 (quoting *In re Kensington Int'l Ltd.,* 368 F.3d 289, 296 (3d Cir. 2004) and *U.S. v. Kennedy,* 682 F.3d 244, 258 (3d Cir. 2012) (internal quotation marks omitted).

[47] 28 U.S.C. § 455(b)(1).

[48] *Amr v. Greenberg,* 2016 WL 7177615, *9 (citing *Liteky v. U.S.,* 510 U.S. 540, 554 (1994); *Selkridge v. United of Omaha Life Ins. Co.,* 360 F.3d 155, 167 (3d Cir. 2004) ("beliefs or opinions which merit recusal must involve an extrajudicial factor")).

[49] *Id.* (quoting *Liteky,* 510 U.S. at 555).

allegations related to $7 million "stolen" from the United States Customs and Border Protection. In the Trustee's Reply and at the hearing on June 28, 2018, the Trustee's counsel explained that:

> The $7 million payment represents a refund of duties incorrectly paid by the Debtors to Customs on account of Customs misclassifying the Debtors' multifunction monitors **imported** into the United States as computer monitors rather than television monitors. The $7 million repayment by Customs was not the result of reliance on fraudulent accounting documents but rather on a detailed reconciliation with Customs regarding duties incorrectly imposed on the Debtors.[50]

The allegations mischaracterize the refund payment by Customs to the Liquidation Trust and do not provide any basis for recusal. Moreover, no evidence of bias or prejudice arises from allegations that Ahmed Amr (who is referred to as the SBC Qui Tam Advocate[51] in the Recusal Motions) was barred from filing documents in this case in connection with the alleged $7 million theft. As discussed earlier, I barred Amr from further filings in the bankruptcy cases based upon his agreement in the Shareholder Settlement.

A reasonable person, fully informed of all of the facts and the history of this case, would not question my impartiality in deciding the matters before me in this bankruptcy case. Further, upon self-examination of my consideration of the various pleadings filed by the Debtors, creditors,

---

[50] Reply, ¶ 10 (emphasis in original). The Reply further notes that "[t]he Liquidation Trust retained the Debtors' prior counsel in addressing this issue, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, without whose assistance the Customs refund might not have taken place or been significantly less than was actually received." *Id.* at n. 9. *See also* Tr. 6/28/2018 at 15:17 – 24. The Plan provides that "[t]he Liquidation Trustee, on behalf of the Liquidation Trust, shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such Causes of Action without the consent or approval of any third party and without any further order of the Bankruptcy Court . . . ." (Plan, Article XII(A)(1)). Consequently, the Trust did not file a request for court approval of - - and I did not review any documents regarding - - the Customs refund.

[51] Ahmed Amr asserted a right to bring a *qui tam* action earlier in this case, but I determined that "a relator [*i.e.*, a person bringing a civil action in the name of the United States to enforce the False Claims Act] cannot proceed *pro se* because 'the relator represents the interests of the United States, but a lay person cannot represent another party in court.'" *In re Syntax-Brillian Corp.*, 554 B.R. 323, 327 (Bankr. D. Del. 2016) (quoting *Tyson v. Wells Fargo Bank & Co.*, 78 F.Supp.3d 360, 363 (D.D.C. 2015)).

shareholders and others in this case, I conclude that I have no bias or prejudice against the shareholders or other constituencies before me.

This is not the first recusal motion filed by shareholders against myself and other judges in this case. Previous recusal motions, which included their own litany of unsupported factual allegations, have been considered and denied. [52] The Recusal Motions at bar follow the same pattern of objecting to prior rulings and general dissatisfaction with the actions of the Liquidation Trust and the outcome of the bankruptcy case. Judge Shannon's previous explanation (which I have previously quoted and which some shareholders stubbornly refuse to accept) is an excellent clarification of the bankruptcy process for the shareholders, and bears repeating:

> Companies sometimes fail. Failure can occur for a host of reasons, including mismanagement, changing tastes or technology, insuperable competition, even natural disasters. And companies can and do fail when they are victims of fraud. The failure of a corporation can bring loss and suffering to employees and management, vendors, customers and investors, all of whom hope at least for some recovery from the failed enterprise. Congress has decreed that shareholders in a bankrupt company cannot receive anything on account of their investment until all secured, priority and unsecured creditors are paid in full. This principle applies even when the company - - and by extension, the shareholders - - is a victim of fraud.
> . . . .
>
> Syntax was the victim of a fraud, apparently perpetrated by certain members of its management team as well as its suppliers in the Far East. The Court is acutely aware of the suffering endured by Syntax's shareholders on account of the collapse of the company. The Court's sympathy, however, does not change the economic reality and legal principles in play. Under the Plan, there is not

---

[52] *Amr v. Greenberg*, 2016 WL 7177615 (denying the "Motion to Recuse Judge Gregory Sleet for Abuse of Power, Abuse of Jurisdiction, Racketeering, Proceeding on False Evidence, False Utterances about Forged Documentation and Failure to Report Forgeries to Law Enforcement Authorities, Violations of Appellant's Due Process Rights and for Allowing Judge Brendan Shannon to Ghost Write His Opinions"); *In re Syntax-Brillian Corp*, Bky. Case No. 08-11407, (Bankr. D. Del. December 23, 2016) (Docket No. 2456) (denying the "Motion to Recuse Judge Kevin Carey for Bias and Failure to Clarify Whether the Bankruptcy Court has Subject Matter Jurisdiction Over a Case Involving Massive Forgery and Other Reasons"), motion for reconsid. denied Jan. 27, 2017 (Docket No. 2462); *In re Syntax-Brillian Corp.*, 400 B.R. 21 (Bankr. D. Del. 2009) (denying the "Emergency Motion to Request The Honorable Brendan Linehan Shannon Recuse Himself from the SyntaxBrillian [sic] Case Due to Conflicts of Interests and Undeclared Prior Relationships with FTI and Silver Point").

presently a return for Syntax's shareholders, and there is not likely to be a return in the future.

Regrettably, shareholders of companies that file for bankruptcy relief often (and perhaps typically) see their interests wiped out. This is the case even where the shareholders purchased their shares in reliance upon fraudulent or misleading information: Section 510(b) of the Bankruptcy Code specifically provides that claims arising from the purchase or sale of stock in a debtor are subordinated to all other claims.

Consequently, the result in this case is neither unusual nor inconsistent with well-settled legal principles. [53]

I harbor no bias, prejudice or contempt toward the shareholders. I acknowledge the damage resulting from the fraud visited upon stakeholders in this proceeding. But these are hardships that cannot be ameliorated by this Court (or by the substitution of another judge). Rather, shareholders hold a place at the lowest level of the priority and distribution scheme dictated by the Bankruptcy Code. A reasonable person in possession of all the facts would agree that there is no basis for me to disqualify or recuse myself from presiding over the chapter 11 cases. The Recusal Motions will be denied.

(2)   Change of Venue

In the "Demand of Dr. Yehia Amr for a Change of Venue for the Hearing for an Order and a Final Decree" (Docket No. 2504), Dr. Yehia Amr sets forth many objections and allegations, including (for example):

- The individuals and entities who filed the abusive petition chose this venue because they have influence on the court in this venue. (¶ 2).

- The judges presiding over these illicit Chapter 11 proceedings are influential judges. They have influence on the District Court and the Third Circuit. This venue is not a safe venue for victims of Ponzi scheme. There is no law in the Delaware venue. The judges in this venue make the rules as they go and break the law at will. They have sullied the Delaware venue and it is unlikely that this is the only case

---

[53] *In re Syntax-Brillian Corp.*, 551 B.R. 156, 157–58 (Bankr. D. Del. 2016)

where they have actively engaged in defrauding small creditors for the benefit of Silver Point and the other masters of the Universe. (¶ 25).

- Judge Kevin Carey induced the Clerk of the Court to engage in spoliation of evidence and tampering with court records. (¶ 32).

- Judge Kevin Carey had a personal interest in quashing legitimate discovery requests related to the illicit $7 million Newell transaction. (¶ 34).

- The Delaware venue has suppressed testimony in previous hearings and resorted to police power to evict legitimate and critical voices from making their record. (¶ 38).

- The Delaware venue judges are acting in their own self-interest and committing judicial atrocities in their own self-interest and committing constitutional atrocities in their own self-interest and facilitating the theft of money in their own private interests and proceeding on false evidence in their own interests and now they seek to destroy forged documents in their own interests. (¶ 39).

- Most of the American victims of the SBC forgery scheme live on the West Coast. A chance [*sic*] of venue would give them an opportunity to stand up and be heard. In my family alone, we have five victims who all reside in the Seattle area. Other victims have been consulted and have agreed to support the change of venue to Seattle. (¶¶ 41-42).

- There are related criminal proceeding in Edmonds, Washington. The SBC Liquidation Trustee and Ms. Newell and the Court are fully informed on those criminal proceedings which involve my brother, Ahmed Amr. The judges in this venue interceded in the Edmonds Proceedings to corroborate a false police report that my brother has harassed Margaret Newell. Judge Kevin Carey will be called to testify at the trial by jury in his role in the Edmonds case. (¶ 43)

Dr. Amr failed to appear, either in person or by telephone, at the June 28, 2018 hearing. In any event, any request for a change of venue is untimely and part of a meritless effort to delay closing of these cases or to find yet another judge more to the liking of certain shareholders. His request for a change of venue will be denied.

(3) Final Decree Motion

In the Final Decree Motion, the Trustee asks this Court to enter an order and final decree in the chapter 11 cases, which includes seven specific forms of relief:

(i)     Authorizing the Trustee to make a final distribution,

    (ii)      Establishing a reserve for anticipated ongoing litigation expenses,

    (iii)    Approving a bar order,

    (iv)    Closing the chapter 11 cases,

    (v)     Terminating the engagement of Epiq Bankruptcy Solutions, LLC,

    (vi)    Further extending the term of the Trusts, and

    (vii)   Authorizing destruction or disposal of all remaining documents, books and records of the Debtors and the Trusts (the "Books and Records") at the time specified in the Final Decree Motion.

More than ten shareholders filed separate objections to the Final Decree Motion. Many of the objections, including the one filed by Brent Barker,[54] are in the same format and contain, more or less, the same charges, including:

- The SBC Liquidation Trustee is incapacitated and has no legal authority to file the motion. (¶ 1).

- The SBC Liquidation Trustee has already destroyed the falsified books and records relating to the sale of Vivitar. The Vivitar books and records were destroyed without being inspected. (¶ 3).

- The destruction of the forgeries would adversely impact ongoing litigation in other jurisdictions. (¶ 4).

- Not a single individual has been charged with forgery and the forged documents [sic] because the SBC Liquidation Trustee has refused to hand the forgeries to state or federal law enforcement agencies. (¶ 9).

- The SBC Liquidation Trustee has yet to provide accurate and adequate financial disclosures to the victims of the SBC forgery scheme. The SBC Liquidation Trustee has had ten years to put [sic] release adequate financials, which should have been filed before the First Day's Hearing. (¶ 10).

- I object to this court having any say in any matter related to the forgeries. This is an administrative tribunal and it is not the proper jurisdiction to adjudicate a crime of forgery. (¶ 14).

---

[54] Barker Objection, Docket No. 2499. Barker's Objection also includes a number of objections to the destruction of Books and Records, which are set forth *infra*.

- I intend to file documents and an interrogatory in support of my objection. I expect all the parties who were noticed on these proceedings to appear to be examined so I can get them to answer some questions they have been dodging for ten years. (¶ 17).

- The directors who authorized the filing of the Chapter 11 petition have all been incriminated in the forgery scheme. I would like the Last hearing to result in referrals to the special counsel. (¶ 18).

- Finally, I object to Judge Carey presiding over the case. He intruded in the case after we impeached Gregory Rayburn. We should have been done two years ago and he put a break on our recoveries and he took the forged documents hostage and treated us with utter contempt. (¶ 19).

- I object to any distributions other than distributions to the victims of the forgery scheme. I object to any distributions to Silver Point and City Corp. [sic] I object to any distributions to Vincent Sollitto who is still collecting on the claim. (¶¶ 20, 21, 22).

- The money in the Liquidation Trust is stolen money. The $7 million that was stolen from the Customs Service is stolen money. (¶ 23).

- I object to the proposal to set up a million dollar fund to the SBC Liquidation Trust to defend themselves against us. They should defend themselves out of their own pocket and they have already facilitated the theft of almost all the assets of the forgery scheme estate. (¶ 25).

- I have no problem with shutting down the case because it should never have been filed. I object to closing it on terms dictated by the SBC Liquidation Trustee or on terms dictated by Judge Kevin Carey. (¶ 26).

- I object to any and all Bar orders that would restrict me or similarly situated victims from pursuing claims in other jurisdictions. Any restriction approved by this court is null and void. This is not even a legal tribunal. It is an administrative tribunal. We need a trial by judge and jury in a neutral jurisdiction with the forgeries in evidence. The Bankruptcy Court is incapacitated and does not have the jurisdiction to prevent me from reserving all rights against all parties that facilitated the theft of my money. Any party that tries to bar me from pursuing my natural and fundamental right to recover my stolen money will incur further liabilities for obstruction of justice. (¶ 27).

- I reserve the right to motion for sanctions against the SBC Liquidation Trust and their counsel in any jurisdiction for this blatant attempt to destroy forged documents and for their role in the theft of tens of millions of dollars from the SBC forgery scheme. (¶ 28).

17

Throughout the tortured history of this proceeding, many shareholders filed pleadings and appeared in court, personally or by telephone. Each has been given ample opportunities to be heard. But only Brent Barker appeared at the June 28, 2018 hearing (by telephone) to press his objection to the Final Decree Motion. A discussion of the merits of the Barker objection follows. The remaining objections and motions are denied for failure of the objectors to appear and prosecute their objections.[55]

(i)     Final Distribution

The Trustee seeks authority to make a final distribution in an amount equal to 8% of the Allowed amount of each Allowed General Unsecured Claim, which will be in full and final distribution of the Liquidation Trust Assets (except the amount held in the Litigation Reserve). Since entry of the Interim Distribution Order, the Liquidation Trust asserts that it has resolved all disputed claims and, consequently, has established the universe of Allowed General Unsecured Claims entitled to a distribution from the Liquidation Trust. The Trustee further asserts that, upon receipt of the final 8% distribution, the holders of the Allowed General Unsecured Claims will have received a cumulative 29% distribution.

Barker objects to the Trustee's distribution of any funds, other than to shareholders. However, the confirmed Plan provided that shareholders would not receive any distributions unless all other creditors were paid in full.[56] The Trustee's proposed final distribution is consistent with

---

[55] The filings that are dismissed for failure to appear and prosecute include the objections to the Final Decree Motion filed by Frank Waitkus (Docket No. 2498), Denise Warren (Docket No. 2500), Rod Comer (Docket No. 2502), Yehia Amr (Docket No. 2503), Gregory Lange (D.I. 2507), and Alan Levine (Docket No. 2510). This also includes the objections to destroying books and records filed by Frank Waitkus (Docket No. 2497) and Laura Lipton (Docket No. 2506), the Notice of Demand on the Clerk of Court to Complete the Record filed by Yehia Amr (Docket No. 2506), and the Motion to Disqualify and Terminate the Liquidation Trustee and his Professionals filed by Alan Levine (Docket No. 2509).

[56] Plan, Article IV(A)(7).

18

the terms of the Plan, as well as core bankruptcy priorities, and, therefore, the objection will be

overruled.

    (ii)    <u>Litigation Reserve</u>

    The Trustee asks that the Court authorize the establishment of a $1 million reserve (the

"Litigation Reserve") to pay the fees and expenses of the Trustee and his professionals that are

anticipated to arise from the continued litigation by the shareholders in jurisdictions outside of this

Court. The Trustee noted that:

> Undaunted by the repeated rulings from this Court that their claims have no merit,
> the Shareholders have continued in their efforts to assert their unfounded claims
> in the U.S. and abroad. Notwithstanding the releases, injunction and exculpations
> set forth in the Plan Documents, the Shareholder Settlement and the Bankruptcy
> Court orders, pro se litigation was initiated in Canada last year against the
> Debtors' former financial advisors, and the Shareholders have threatened that
> numerous additional actions will be initiated by the Shareholders against the
> Trusts, the Trustee, his professionals and others in the United States and beyond.[57]

    At the hearing, the Trustee's counsel read four emails into the record to provide an example

of the many emails sent by Ahmed Amr to the Trustee threatening future shareholder litigation.

1. An email dated October 31, 2017: "I shall take the appropriate legal remedies
   to compel Custom Services to recover the illicit conveyed funds."[58]

2. An email dated January 10, 2018: "I am determined to see that Mark Kenney
   and Kevin Carey and Brendan Shannon will do time for forgery and
   racketeering. If things don't start to happen soon, and if the DOJ continues to
   obstruct justice, I will be filing a police report against the United States
   Attorney General, Mr. Kennedy, Ms. Sarkessian, Margaret Newell, the United
   States Trustee, and Pepper Hamilton. I'm just getting started here. And the
   DOJ, who facilitated these illicit proceedings and the illicit transfer of 7 million,
   will have to face the consequences in the court of law in front of a jury."[59]

3. An email dated March 8, 2018: "To all noticed on this email" [that includes
   people from the Department of Justice, U.S. Trustee's Office, counsel for the
   Trustee, and the Trustee] "You will have to deal with me in Washington State.
   And once we are done here, I will be helping other victims file individual suits

---

[57] Final Decree Motion, ¶ 28. *See also* Berman Decl., ¶ 5 - ¶ 8.
[58] Tr. 6/28/2018 at 7:11 – 15.
[59] Tr. 6/28/2018 at 7:16 – 8:5.

in their Municipal Courts. This is going to be a jury trial. The forgeries will be in evidence. You won't have a crooked Delaware Judge to hide behind. You'll see the kind of judges that they have here, elected judges."[60]

4. An email dated April 23, 2018: "I will pursue individual cases against every one of you, and encourage other victims to do the same. So those folks on the east coast need to get their head[s] around the fact that you will be sued right here in Washington State, regardless of domicile."[61]

In the Declaration, the Trustee stated: "[t]he Creditor Representatives have approved the establishment and amount of the Litigation Reserve, and the Litigation Reserve is permitted under the Plan."[62] The Trustee also asserts that the Litigation Reserve is necessary to fulfill the Trust's obligation to indemnify the Trustee and his professionals.[63]

The Trustee also proposes that "[t]o the extent I determine, in the exercise of my business judgment, that there no longer remains a need to maintain the Litigation Reserve, then (i) to the extent that there is more than $50,000 remaining in the Litigation Reserve, I will distribute the funds on a pro rata basis to the holders of Allowed General Unsecured Claims in accordance with the provisions of the Plan, or (ii) if the funds remaining in the Litigation Reserve are less than $50,000, those remaining funds will be donated to a 501(c)(3) charity."[64]

Barker objects to the Litigation Reserve by arguing that that the Trustee and his professionals "should defend themselves out of their own pocket and they have already facilitated

---

[60] Tr. 6/28/2018 at 8:6 – 8:19.
[61] Tr. 6/28/2018 at 8:20 -9:2.
[62] Berman Decl. ¶ 5. *See also* Plan, Article VIII(A)(1) ("Distributions will be made by the Liquidation Trustee in the following order of priority (i) first, to satisfy the expenses of administering the Liquidation Trust, including reasonable fees and expenses of any attorneys, advisors, other professionals and employees employed by the Liquidation Trustee . . ."); Litigation Trust Agreement, 4.1(d) ("the Liquidation Trustee may retain an amount of net cash proceeds or net cash income reasonably necessary to . . . satisfy current and projected expenses of the Liquidation Trust . . . subject to a budget approved by the Creditor Representatives.").
[63] Final Decree Motion, ¶30 citing Litigation Trust Agreement, Art. 7.4(b)., Art. 8.1.
[64] Berman Decl., ¶ 8.

the theft of almost all the assets of the forgery scheme estate."[65]  This reasoning lacks any basis in fact on this record.

The Trustee's evidence supports the finding that the proposed Litigation Trust is necessary, appropriate and permitted under the Plan.  The Trustee is correct that the shareholders do not have any economic interest in the funds that will be used for the Litigation Reserve.  The objection is overruled.

      (iii)    Bar Order

The Trustee requests that the order granting the Final Decree Motion (the "Final Decree Order") include language consistent with (i) the *Barton* doctrine, and (ii) the Plan provisions providing for exculpation and indemnification of the Trustee and his professionals.

The *Barton* doctrine, set forth in an 1881 Supreme Court decision, provides that "before suit is brought against a receiver[,] leave of the court by which he was appointed must be obtained."[66]  The litigant's purpose in suing the receiver in another court is to gain some advantage over other claimants upon the assets in the receiver's hands.[67]  Any judgment against the defendant in his capacity as receiver could result in execution against the property in the receiver's hands.[68]

The Third Circuit Court of Appeals determined that the *Barton* doctrine applies to bankruptcy trustees and held that a party must first obtain leave of the bankruptcy court before it brings an action in another forum against a bankruptcy trustee for acts done in the trustee's official capacity.[69]  Other courts have decided that the *Barton* doctrine applies with equal measure to

---

[65] Barker Obj., ¶ 25.
[66] *Barton v. Barbour*, 104 U.S. 126, 128, 26 L.Ed. 672 (1881); *See also Richardson v. Monaco (In re Summit Metals, Inc.)*, 477 B.R. 484 (Bankr. D. Del. 2012).
[67] *Barton*, 104 U.S. at 128.
[68] *Id.*
[69] *In re VistaCare Grp., LLC*, 678 F.3d 218, 224 (3d Cir. 2012).

liquidating trustees working through the vehicle of a liquidating trust that was created pursuant to orders of bankruptcy court.[70]

The Trustee requests language in the Final Decree Order that bars filing of lawsuits against the Trustee and his professionals without prior leave of this Court. The Trustee argues that adding such language to the Final Decree Order will "spare the expense of submitting briefing on the protections of the *Barton* doctrine in other fora in response to Shareholder lawsuits, [and] conserve both Trust and judicial resources . . . ."[71]

For the same reason, the Trustee seeks to include language in the Final Decree Order following the language in the Plan Documents that exculpates the Trusts' fiduciaries and their professionals for post-petition acts or omissions taken in connection with, or related to, the chapter 11 cases.

Barker objects to the inclusion of a bar order in the Final Decree Order "that would restrict me or similarly situated victims from pursuing claims in other jurisdictions" and argues that any such restriction would be null and void, because the Bankruptcy Court is without jurisdiction to enter such an order. Further, he writes, "[a]ny party that tries to bar me from pursuing my natural and fundamental right to recover my stolen money will incur further liabilities for obstruction of justice."[72]

I have both the jurisdiction and the authority to include a bar order in the Final Decree Order pursuant to 28 U.S.C. § 1334(b), 28 U.S.C. § 157(b)(2)(A) and 11 U.S.C. § 105(a).[73] Given

---

[70] *In re Circuit City Stores, Inc.*, 557 B.R. 443, 449 (Bankr. E.D.Va. 2016) (citing *In re Crown Vantage, Inc.*, 421 F.3d 963, 973 (9th Cir. 2005)); *See also In re Landamerica Fin. Grp, Inc.*, No. 08-35994, 2013 WL 1819984, *3 (Bankr. E.D. Va. Apr. 30, 2013).

[71] Final Decree Motion, ¶ 35.

[72] Barker Obj., ¶ 27.

[73] *See also In re Resorts Int'l, Inc.*, 372 F.3d 154, 168-69 (3d Cir. 2004)("[When] there is a close nexus to the bankruptcy plan or proceeding, as when a matter affects the interpretation, implementation,

the history of this case, I agree that imposition of a bar order will assist in conserving the Trust's assets and judicial resources, and is necessary for the orderly implementation of the Plan and to bring finality to this bankruptcy proceeding. The objection to the request for a bar order is overruled.

    (iv)    <u>Plan for Destruction of Books and Records</u>

The Trustee's Final Decree Motion requests authorization to destroy the Debtors' Books and Records. The Trustee separates the Books and Records into two groups:

    (i)    <u>The Retained Books and Records</u>:  This group is comprised of documents used as evidence in litigation matters brought by the Trustee, or produced in the investigation by the Securities and Exchange Commission that resulted in consent decrees by most, but not all, of the Debtors' key officers and directors.[74]  The Trustee estimates that these records consist of approximately 350 banker boxes.[75]  The estimated cost for storing, retrieving and ultimately destroying the Retained Books and Records will be approximately $14,000.

    (ii)    <u>The Unnecessary Books and Records</u>:  Some of the documents in this group were created as long ago as 2003.   The group is comprised of three categories: (a) ordinary course of business documents related to entities other than the Debtors, which non-debtor entities had no involvement in the sale of LCD products (*e.g.*, Brillian Corporation documents prior to the merger with Syntax and Three-Five Systems documents related to operations prior to the spin-off from Brillian Corporation);  (b) ordinary course administrative forms of the Debtors and Syntax

---

consummation, execution, or administration of a confirmed plan or incorporated litigation trust agreement, retention of post-confirmation bankruptcy court jurisdiction is normally appropriate.").

[74] Berman Decl. ¶ 13.

[75] Berman Decl. ¶ 16.

prior to its merger with Brillian Corporation which documents are wholly unrelated to the shipping and accounting forgery (*i.e.,* miscellaneous contracts, agreements, files, orders, applications, reports, etc.) and (c) hard copies of documents already maintained in electronic form by the Trusts on servers where the electronic copy of such document constitutes a Retained Document.[76] The Trustee estimates that the Unnecessary Books and Records consists of approximately 625 boxes.[77] If the Trustee is required to retain the Unnecessary Books and Records, the Trust would incur about $25,000 in expenses related to storage, retrieval and ultimate destruction of such documents.[78]

The Trustee does not seek to destroy all of the documents simultaneously. The Trustee proposes to preserve the Retained Books and Records for a period of six years from entry of the Final Decree Order (the "Destruction Date").[79] The Trustee states that there is no business justification for continuing to incur costs related to warehousing and upkeep of the Unnecessary Books and Records.[80] Therefore, the Trustee proposes to destroy the Unnecessary Books and Records upon entry of the Final Decree Order.

More than half of Barker's objection to the Final Decree Motion opposes destruction of the Books and Records for the following reasons:

- The SBC Liquidation Trustee is not legally authorized to motion [*sic*] for the destruction of forged documents. (¶ 2).

- There are no legal grounds for destroying forged documents. (¶ 5).

---

[76] Berman Decl. ¶ 14.
[77] Berman Decl. ¶ 16.
[78] *Id.* In the Declaration, Berman also notes "[t]here are several cabinets of Books and Records that were not included in the box counts. . . . Those records will be categorized and treated as Retained Books and Records or Unnecessary Books and Records as appropriate based on the categories [described in the Declaration]." *Id.* at ¶ 15.
[79] *Id.* at ¶ 13.
[80] *Id.* at ¶ 14.

- I and other similarly situated victims need the books and records to recover our losses in other jurisdictions in a trial by jury. We will need the forgeries to properly litigate those cases. (¶ 7).

- An administrative judge has no legal authority to grant the relief that includes destruction of forged documents. (¶ 8).

- The destruction of SBC's forged sales invoices and forged shipping documents and forged agreements and destruction of SBC's falsified books and records would be a crime of forgery in and of itself. (¶ 11).

- The destruction of the forgeries would violate the Federal Rules of Evidence. We have been denied access to the evidence for ten years. Now the SBC Liquidation Trust is trying to destroy the evidence so we can never have a chance to inspect it. (¶ 13).

- There is an outstanding motion to demand the appointment of a special counsel. The destruction of the forged documents would negatively impact the work of a special prosecutor. (¶ 15).

Bankruptcy Code § 554 provides that "[a]fter notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate."[81]  Bankruptcy Rule 6007(a) requires that the trustee provide notice of a proposed abandonment to "the United States trustee, all creditors, indenture trustee, and committees . . . ."[82]  The Trustee represents that the Final Decree Motion, which includes the request to dispose of the Books and Records, was served on the U.S. Trustee, the Liquidation Trust Beneficiaries (*i.e.,* all holders of Allowed General Unsecured Claims) and the Lender Trust Beneficiaries, all persons and entities who filed a request for notice pursuant to Bankruptcy Rule 2002 and the shareholders service list (attached as Exhibit C to the Final Decree Motion).[83]

---

[81] 11 U.S.C. § 554(b).
[82] Fed. R. Bankr. P. 6007(a).
[83] Final Decree Motion, ¶ 56.

The Trustee has complied with applicable bankruptcy rules and has provided adequate notice and opportunity to be heard regarding his request to dispose of the Books and Records.

"The Trustee's power to abandon property is discretionary and the Court will generally defer to the Trustee's judgment in determining whether to abandon a property."[84] "The court only needs to find the trustee made: (1) a business judgment; (2) in good faith; (3) upon some reasonable basis; and (4) within the trustee's scope of authority."[85] "The party opposing abandonment must show some likely benefit to the estate, not mere speculation about possible scenarios in which there might be a benefit to the estate."[86]

The objections to the Trustee's proposal for disposing of the Books and Records continue to raise the same arguments that have been repeatedly rejected by courts in this Circuit. As argued by the Trustee:

> These cases are ten years old. The Objecting Shareholders can point to no legitimate claim or purpose for which they require access to the Books and Records. On the other hand, the estates needlessly would be put to further expense to review and redact records for privilege and, in the case of employee records, confidential or personally identifiable information, if all of the Books and Records were to be opened to the Objecting Shareholders. The Trustee and his professionals also have serious concerns that if the Objecting Shareholders are provided with copies of the Books and Records, the Objecting Shareholders will misuse those documents to fuel their continued improper efforts to have shareholders paid before allowed claims of general unsecured creditors. Simply put, giving out-of-the-money Objecting Shareholders access to the Books and Records, when they have no legitimate interest in those records, would only be throwing gasoline on a fire that has long burned out of control.[87]

---

[84] *In re Moore*, No. 15-10174, 2015 WL 5674430, *9 (Bankr. D.N.J. Sept. 25, 2015) (quoting *In re Slack*, 290 B.R. 282, 284 (Bankr. D.N.J. 2003) aff'd 112 Fed. Appx. 868 (3d Cir. 2004)).

[85] *Slack*, 290 B.R. at 284 (citing *In re Fulton*, 162 B.R. 539, 540 (Bankr. W.D. Mo. 1993)).

[86] *Id.* (citing *In re Cult Awareness Network, Inc.*, 205 B.R. 575, 579 (Bankr. N.D. Ill. 1997)).

[87] Reply, ¶ 9.

The objection asserts that the Books and Records contain forged documents that the Trustee never turned over to state or federal law enforcement agencies or a "special prosecutor." However, the Trustee represents that:

> The Trustee discovered forged shipping and purchasing documents during the course of his investigation into claims against fiduciaries and auditors. The Liquidation Trustee, through special litigation counsel, Diamond McCarthy, provided copies of the forged documents to the SEC and cooperated with the SEC's investigation into such wrongdoing. Ultimately, the SEC was successful in obtaining judgment against perpetrators of the forgeries.[88]

The Trustee proposes to retain certain records that were used in litigation and the SEC's investigation for a period of six years. The Trustee has weighed the costs and benefits of retaining the records against their usefulness and has arrived at a reasonable plan for destruction of those records that is in the best interest of the Trust and its beneficiaries. Barker's objection does not raise any new or valid arguments to rebut the reasonableness of the Trustee's proposal. Therefore, I will overrule the objection to the Trustee's proposal for disposing of the Books and Records.

(v)   Closing the chapter 11 cases, terminating engagement of the Claims Agent, and Extending the Trust Term

Barker's Objection did not address the three remaining requests for relief in the Final Decree Motion: *i.e.,* closing the chapter 11 cases, terminating the engagement of Epiq Bankruptcy Solutions, LLC and further extending the term of the Trusts. These requests are somewhat routine and are appropriate under the terms of the Plan and applicable sections of the Bankruptcy Code and the Bankruptcy Rules, as stated in the Final Decree Motion. Therefore, these three requests will be granted.

---

[88] Reply, ¶ 12.

CONCLUSION

For the reasons set forth above, the Recusal Motions, the Disqualification Motion and the Demand for Change of Venue will be denied. All objections to the Trustee's Final Decree Motion will be overruled and the Trustee's Final Decree Motion will be granted in full.

An appropriate Order follows.


BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE


Dated: July 18, 2018

28